May it please the Court, good morning. I'm Julie McCoy, appearing on behalf of Appellant Thomas Rubin. Mr. Rubin is asking this Court to correct the denial of due process that occurred below in the form of the Bankruptcy Court's asset freeze order issued in violation of this Court's and the United States Supreme Court's rulings and without obtaining personal jurisdiction over Mr. Rubin. We are asking this Court to reverse the preliminary injunction and to direct the lower court to enter a new order denying the preliminary injunction for two separate and independent reasons. First of all, the Bankruptcy Court's failure to obtain personal jurisdiction over Mr. Rubin voids the preliminary injunction for failure to comport with the most basic requirements of due process of law. And secondly, the issuance of the asset freeze order in favor of a general unsecured creditor for purposes of securing a prospective money judgment is in violation of and patently wrong under this Court's holding the Dateline case and the United States Supreme Court's holding in Grupo Mexicano. Did Mr. Rubin ever get actual notice of the application for TRO, the preliminary injunction? Your Honor, if you're asking me, I do not personally know the answer to that question. What I can tell you is that I have scoured the record and found that Mr. Rubin nowhere concedes that he had actual notice. Did he ever appear in the case at all personally? Absolutely not, Your Honor. And that's a critical, critical point, because the cases that address the issue of the implied appointment of an agent for service of process really turn on the issue of whether or not the defendant has participated actively and extensively in the case, and whether there are facts from which it can be inferred that the client authorized the attorney as his or her agent for service of process. So we think that is a very fundamental issue here. Of course, the other issue is the authority of the Court to actually issue the preliminary injunction in this case. But I'd like to address the personal jurisdiction issue a little further. As this Court, I'm sure, knows, it is fundamental that a court cannot issue injunctive relief against a party without first obtaining personal jurisdiction over that party. And it is likewise fundamental that proper service of the applicable injunctive motion or application is critical to obtaining that personal jurisdiction. In this case, the bankruptcy rules, specifically 7065 and 7004, provide that a motion for preliminary injunction is to be served in the same manner as service of process on a summons and complaint. Here, the bankruptcy court committed clear error, we contend, by holding that the service on Mr. Rubin was properly effected by mail service of the preliminary injunction papers to an attorney that represented Mr. Rubin in other matters, but never, ever appeared before the bankruptcy court on Mr. Rubin's behalf and was never authorized to serve as his agent for service of process. He didn't appear for Mr. Rubin in the FOCUS media bankruptcy? Absolutely not, Your Honor. What are all those quotes from the district judge about where Mousseau apparently says, I'm in the bankruptcy case and I'm here for Mr. Rubin? Your Honor, there are a number of instances that are cited to in the record where Mr. Mousseau was asked the question, do you represent Mr. Rubin? And Mr. Mousseau responded, yes, I do. But in all of his appearances before the bankruptcy court, and the transcripts clearly reflect this, he was appearing on behalf of the alleged debtor, FOCUS media. What exactly difference does that make? If he says, I'm here for or I'm Rubin's lawyer, why isn't that sufficient? I think it makes a huge difference, Your Honor, because the critical inquiry is not the attorney's presence in the case, but whether the attorney has been appointed or authorized by the client or by some information. He says I'm his lawyer. But he never said he was appearing in the proceeding on Mr. Rubin's behalf. And, in fact, if the Court looks at the docket of the involuntary bankruptcy proceeding, which is quite extensive, you will find that nowhere did Mr. Rubin ever file any motion or any opposition or seek any kind of relief or otherwise petition the Court or appear before the Court. Mr. Mousseau's presence there, although he represented Mr. Rubin in other separate matters, Mr. Mousseau's appearance before the bankruptcy Court was solely as counsel for FOCUS media. Well, let's suppose that's true. He wouldn't have to be his lawyer to be his agent, right? Absolutely, Your Honor. That's quite right. Okay. So it really doesn't matter that he's appeared for him. What matters is the guy who represents, Mousseau represents, that he is Rubin's representative. Your Honor, I would differ on that. Even in the two courts that have endorsed this concept of implied agency, which, by the way, we don't think should be the law in the Ninth Circuit. We don't think it is the law. We think this is a case of first impression and that it would be bad law for this Court to endorse that implied agency theory. But even in those cases, the two district courts of New York that occasionally take up this issue look to two things. One, what was the client's intention? Did the client intend to appoint the attorney as agent for service of process? And two, what do all the surrounding circumstances of the relationship between the two say about the extent of the authority that should be implied in the attorney? And a related point is those cases articulate over and over again that it's not sufficient that the attorney merely represents the client in other, albeit related, litigation. They need to be an agent for all purposes, a general agent, if they're going to be viewed as that kind of implicit agency. It seems to me that's what the cases say. But I'm interested, what in the record do we have that evidences Mr. Rubin's intent with respect to Masseau one way or the other? The one thing that we do have in the record, Your Honor, is the declaration of Mr. Rubin where he affirmatively says, I never appointed Mr. Masseau as my agent to receive service of process. And, in fact, there is just no evidence in this record that he made such an appointment. Now, Mr. Masseau did take – I'm sorry, did I answer your question? Well, I have another related question, which is, what kind of service would have been appropriate? Are you saying that in this case that the credit – well, this was an adversarial proceeding now, a new piece of litigation separate from the bankruptcy but arising from the bankruptcy, and you're suggesting that the Hague Convention should have applied because Mr. Rubin now is resident in Paris. So they would have had to have gone through that process? That's correct, Your Honor. In the absence of an agent appointed by Mr. Rubin to receive process for him, they would have had to have gone through that process. And we think it's significant here that no attempt to do that was even made, even though the records of the bankruptcy court proceedings tend to show that Mr. Rubin's address in France was known to them. And this is not a highly complicated procedure. But I think more importantly, you know, Rule 4 has incorporated in the bankruptcy rules in Rule 7004 has some very rigorous procedures for service of process on individuals as well as corporations, and those procedures are in place to safeguard the due process rights of those litigants. And this Court, and no court that I'm aware of, has ever relied upon the concept of actual notice or the potential of actual notice as a substitute for compliance with the Rule 4 very rigorous procedures. If that were the case, then Rule 4 at the end of that long laundry list of methods to properly effect service of process would simply have a catch-all that would say, or service in any other manner reasonably calculated to give actual notice to the defendant. It does not so provide. We think that the bankruptcy court in this case created a new and very dangerous exception to Bankruptcy Rule 7004b-8. And we think that for this Court to embrace the concept of implied appointment of an agent for service of process would fundamentally and forever change the nature of the threshold inquiry into whether or not the court has personal jurisdiction over the defendant, whereas before, that inquiry has always been objective in nature. We look at the steps required by the statute and whether those have been satisfied, and in the case of substitute service, whether there is an express authorization for the agent to receive service of process. Roberts. Suppose you're right and we agree with you. What happens now? We would reverse the district court, which affirmed the bankruptcy court, and the preliminary injunction would be dissolved. Yes, Your Honor. And Mr. Rubin is then absolved of the responsibility of dealing with the assets. That's correct, Your Honor. Exactly. They would start again. I presume they'd have the right to start again and get another preliminary injunction. I'm just trying to think this through, what happens. They could serve him properly and refile for the injunction, right? Yes. I presume that they could and start over before now a different judge in the bankruptcy court, but I can't think of a reason why they could not pursue that. And what is the risk, say, from the plaintiff's or creditor's point of view, which is there would be maybe a few days' period of time during which Mr. Rubin could move the funds, his personal funds, which is what's enjoined here somewhere, and they wouldn't be there at the end of the lawsuit? Well, Your Honor, I don't necessarily agree that if the trustee were to make this application again, it would be granted. I would hope that this time around, Mr. Rubin's counsel would be able to persuade the bankruptcy court correctly that issuing such an asset freeze order is beyond the bankruptcy court's powers and in direct violation of the Groupo decision and this Court's holding in Dateline. You know, the Supreme Court's holding in Groupo is directly on point here. In an action for money damages, which is what this is, the Court has no power to restrain a defendant from transferring or otherwise disposing of his or her assets until an ultimate judgment is entered. And the Supreme Court in Groupo went to great lengths to say that this is the long-established law in this country that a creditor has no rights to interfere with a defendant's use of his or her property until their claim is reduced to a judgment. To quote the Supreme Court in Groupo, And that's what we have here. We think that the entry of this order by the bankruptcy court was beyond its powers. It was in violation of Groupo and in violation of Dateline. Now, while the bankruptcy court found that there were exceptions to the general rule in the case of pending insolvency or the threat of dissipation of assets, the U.S. Supreme Court in Groupo specifically rejected both of those purported exceptions. As to the insolvency alleged exception, the Supreme Court specifically said, we have found that that particular exception does not exist. As to the other alleged exception that Judge March relied upon, the Supreme Court said that where a dissipation of assets is threatened, the remedy for that is provided in the laws of fraudulent conveyance. It is not to ask the Court to exercise its equitable powers to enter a prejudgment restraining order in the nature of an attachment, in essence. And this Court affirmed that in the Dateline case, where it said a court lacks authority to issue a preliminary injunction. Kennedy, let me ask you about that. Suppose you had a fraudulent conveyance case, and the claim by the plaintiff is that the defendant is transferring assets to his wife or to someone for the purpose of concealing them, and that the money is being blown up a racetrack and they have evidence of all of this stuff. Couldn't you then get a restraining order against the wife in that instance, dissipating the property? Your Honor, I don't believe so under the holding in Groupo, because I think what the Court has to look at is the primary relief sought, the remedy sought. And if the remedy sought is in the form of money damages, and the ---- Here, the remedy sought would be to set aside the fraudulent conveyances. And if that happened to be money, that would mean that the money would be, I guess, restored. And if there were fraudulent conveyances and the money were gone, then there would be a money judgment. I guess that's right. Right. And I think that's what the Supreme Court addressed and rejected in the Groupo case, because if the remedy sought ultimately is the payment of money damages and the creditor is a general unsecured creditor, to distinguish a creditor with a lien on specific assets, where there are equitable remedies that flow from that. But if the creditor is general unsecured and the relief sought is monetary damages, then the Supreme Court is very clear that a court cannot issue an asset freeze order in advance of that ultimate judgment. You know, in bankruptcy cases, particularly where you have a closely held corporate ---- This was a subchapter S, I think, wasn't it? Yes, it was. You have a closely held corporation. You have the single shareholder, and the corporation is the debtor. But you've got evidence of all of these allegedly improper loans and distributions from the corporation. And you've got the creditors of the corporation, and are they expected just to sit by and watch this, if you will, alleged looting of the corporation and dissipation of the corporation's assets by the sole ---- Do they have to just sit by and watch that happen? Well, Your Honor, first of all, we dispute that there is evidence of all that. We do dispute that. But to answer your question, there ---- the remedies in California typically for something of this sort would ---- and one of the things that troubled the Supreme Court in the Oboe case is that in California, our pre-judgment remedy for that kind of thing is pre-judgment attachment. And there is a very rigorous statute that sets out what a plaintiff has to prove in order to get a pre-judgment attachment. This plaintiff, this trustee, didn't come close to satisfying any of those statutory requirements, and yet he got a freeze order that's tantamount ---- actually, it's greater than what he could have gotten. Because in the case of an individual where you seek an attachment, you can only attach the properties that you can identify as belonging to the individual. You can't attach $20 million in general funds. So he actually got something far greater than what he would have been able to get in a pre-judgment attachment setting. I see that my time is running out. And I'd just like to conclude by saying that Mr. Rubin seeks a reversal of the preliminary injunction on two separate and independent grounds, either of which we think mandates reversal of this order for the most fundamental reasons of due process of law. Thank you. Thank you, Ms. McClatchy. Good morning, Your Honors. May it please the Court, I'm Peter Anderson. I am the attorney for the Bankruptcy Trustee, the appellee in this case. I will address propriety under Groupo first, if it please you. I think what has not been addressed is a subsequent ruling in Connecticut General Life Insurance Company at 321 Fed 3878. In particular, at footnote 4, it says, Moreover, even if we were to reach the issues who defined it meritless, see United States, X. Rial, Rahman v. Oncology, the district court has authority to issue asset freezing injunction where equitable relief is sought even though substantial money damages are claimed. So I think that by this, the Court is adopting the standard of the Fourth Circuit and allowing asset freeze injunctions. That is what you have here, equitable relief was sought. Did you cite that case in your brief? I think it's subsequent to that. March 3, 2003. Okay. Well, it would have been helpful to have it in a 28J letter or something. But would you give the cite to the clerk afterwards? Of course. Thank you. Of course. Equitable relief is sought in the complaint. It's a fraudulent conveyance complaint. And also for constructive trust. I think that also Groupo specifically accepts this. It says, except in cases of bankruptcy law, except in cases of fraudulent conveyances. And that's what you have here, a true fraudulent conveyance case. Right? $25 million went out the door. We're trying to get it back for creditors. That is the sum and substance of it. Moving to the authority. It seems to me astonishing that Sears would keep paying out this money and it's not seeing any ads or anything else going, because Rubin's keeping all the money, according to the complaint. This must have gone on for quite a long period of time. Well, anyway, you don't have to go there. I don't think that that's true. I don't know that that's in the record before the court. I believe that Sears paid its last money like in February and then filed its suit in March. Oh, okay. Well, it just seemed to me that companies are paying out an awful lot of money. And also, you have to remember, even from this record you can tell, that Focus Media is like 90 days behind. It's doing net 90 payments out. So these ads are getting run, right? But it's still got a bill for 90 days. So it's got 90 days worth of ads running out there. Okay. That's not, I'm just curious. Let me ask sort of a kind of a related question, more out of curiosity than anything else. You've got $20 million at stake. The rules give you a bright line way to serve somebody out of the country. Why don't you spend a few bucks and serve them right instead of messing with Mr. Musso? Number one, this had to be done very quickly. Number two, if you will look at, there's a footnote in the brief. Let me find it for you. While I'm looking for it, I will tell you. And it says that we affected supplemental service of process under 4F3. We did try and serve pursuant to the Hague Convention. We were unable to do so because Mr. Rubin was not there. We then went in and made a motion and said, look, we can't serve under the Hague Convention, which is an alternative anyway. Let us serve other agents. Let us serve his lawyers who are here now. Let us serve other persons. And we did. What is the evidence? I'm very troubled by the fact that it seems that all the evidence that's pointed to is statements by Musso. And he was, perhaps, representing Rubin and or Focus Media in this bankruptcy case, that it doesn't seem to be any evidence in the record that Mr. Rubin intended to appoint him as an agent for all purposes. And in fact, if what is going on here, and now I'm in the realm of speculation, is that Mr. Rubin moved to France so that he wouldn't have to, if he owed Sears money, so he wouldn't have to pay it. That's total speculation. Why would he ever appoint someone here as a general agent for service of process if he's actually really trying to scum with the funds? Let me answer the one question first about the footnote. It's page 17. You're saying a footnote in your brief. The trustee later effected supplemental and additional service upon Rubin under FRCP 4F3, pursuant to an order by serving persons, including lawyers at Rossmillaband and Smith, who were also lawyers in this case. After the trustee was unable to serve Rubin at his address in France in conformity with the Hague Convention, which was unsuccessful because Rubin was not there. I'm now going to give you your statement. Yes, okay. Wait till I do my statement in a second. Doesn't this happen all the time, that you can't effect service on someone who may not want to have service, but that doesn't mean you can still go into court and get the orders you want? I mean, people do evade service of process, right? So just because you tried and failed doesn't mean you effected personal jurisdiction. Well, I'm not going to agree with you that we tried and failed. I'm going to show you the statement now from Mr. Rubin that appears at page 11 of our brief. It was a declaration of Mr. Rubin that he filed in the state court. In which case? Sears-Robuck v. Thomas Rubin, Thomas Sullivan, Los Angeles Superior Court, case number SC-068-185. What's it say? What's it say? Tell me the record citation, because I have it. Okay. Well, it's in my brief at the bottom of page 4. The record citation is not at 9th volume of TER 1621 or 9th volume 1653. Okay. What it says is, and this was a declaration filed with the Los Angeles Superior Court, the entity of Mousseau & Associates, of which Jeffrey Mousseau is the sole proprietor, have been general counsel for Focus Media since April 2001. Jeffrey C. Mousseau, attorney at law, has been general counsel for Thomas Rubin since September 27, 2000. In his capacity as my general counsel, Jeffrey Mousseau has been consulted on a variety of legal matters and has been made privy to confidential financial, tax, and legal information related to myself, the DBA, and Focus. Mr. Mousseau has assisted me with respect to the pending Focus bankruptcy, as well as the prior actions brought by Sears and other media outlets in the State court. That was the declaration that he filed. If what you really want is a statement that says, he can accept my service of process, he's my general guy, you're setting an impossible standard for me. Typically, just generally, the people that designated for service of process, if it's a corporation, it's filed with the state. Everybody knows it. That wasn't the case here, right? Right. And, you know, that is the only quote that I have found. It's the only quote that there is? Pardon me? It's the only quote that there is. Right. That supports your position that it does to me, it's not conclusive, okay? I'm just saying that it does support your position. But it doesn't say anything about future cases and service of process. It says in the bankruptcy case. And now I'm in the bankruptcy case, and he says that he's my lawyer in the bankruptcy case. And this man makes numerous appearances in the bankruptcy court. That was standing counsel's characterization otherwise. He was there throughout the case and virtually every hearing. Now, what hat is he wearing at any given time? Yeah. At certain points, he was forced to acknowledge, yes, I'm Reuben's lawyer. He comes in and he fights the important battle in the case. And what in battle is that? Appointment of the trustee, because that's the guy who's going to go after Mr. Reuben. Now, we didn't know at that time that the $25 million was gone yet. But now the hound dogs are on him, and he's trying to kill that one while it's in the womb. And he fights us on that. And now the battle rages on. You have to remember that this case is different than a typical case, say, in the district court. Or even the Hyakawa case. See, that is an interesting thing because it's an adversarial proceeding. And, I mean, I came from a law firm where we had bankruptcy lawyers and we had litigators. And the bankruptcy lawyers didn't touch the adversarial proceedings because you needed litigators for those. And it was a malphony. And so I question, I wonder if you were had now this adversarial proceeding, whether it's necessarily so that Maseau would even participate there on behalf of Mr. Reuben. You know, he's not here. I don't understand your question. Could you say that again? My question is, Maseau might not have been his lawyer in the adversarial proceeding. I think what you have to remember is, and the other bankruptcy cases, and this is the case of Reisman, say, or Paddington that are cited to you. This isn't, and let me complete a previous thought I was going to make before your comment, because I think it answers your question. In the Hyakawa case, plaintiff doesn't know who defendant is. He comes in and throws a summons in the place, and he leaves. Now, we've already been battling for an entire year. Everybody knows who everybody is. The characters are there. People have made repeated appearances before this Court as the battle has raged over the involuntary. The standard is, at least when you look at the bankruptcy cases, what is it? Have you taken an active part in a proceeding integrally related to the case? I understand all that, but what puzzles me is that that argument goes to actual authority. What was found here was implied agency. No, this argument goes to implicit authority. Well, all right. Have you, for example, for example, and really, this comes out of the misplicit case, which is cited by the opposition. What they cite Paddington for is the proposition that a lawyer came in and fought an important battle in the case, the cash collateral ruling at the front end. Sears did it, in fact, in Paddington Press. Now, why is that important? Because without the cash collateral, the whole case dies. It's an important battle right at the front end of this case. It's exactly what Mousseau did. He came in, he fought the important battle on the opening days of this case to stop the appointment of the trustee. Moreover, when the trustee gets appointed and goes out to the business and he says, knock, knock, knock, who's home? Who's here to hand over the business to me? Who's there? Mr. Mousseau. Well, Mr. Mousseau, who are you? I am Mr. Rubin's personal lawyer. He's the guy. Where is Mr. Rubin? Mr. Rubin's not at home. And he wasn't even at home when we went to France together. The point being, there are repeated instances where the Court is now calling upon the opposition, okay, when are we going to set these depositions? When is Mr. Rubin coming to town, people? When are we going to get him here under oath? Because otherwise, I'm not going to let him testify at the time of trial against the petitioning creditors. Who's here? I'm here. I'm Mr. Rubin's personal lawyer. And I'm here, Judge, to arrange that. I'm here to do that. Three separate instances we're now going through this, right? And in each one, Mr. Mousseau barks up, I am here. And does he arrange it just for Mr. Rubin's schedule? No, for his own. He's making decisions up there concerning what? When this discovery is going to take place. Critical discovery in this case, I might add. And he's controlling it. So it's not just that. I would suggest to you, it, it, counsel said that we had to comply with highly complicated rules. I've just got a note to myself under Garupo, but, I mean, under the Hague Convention. But you don't have to do that. That's only one alternative. As concerns, I just have some other notes. As concerns Dateline, that was clearly just a breach of contract case where there wasn't even a breach of contract here. This was, once again, a case for constructive trust, fraudulent conveyances, and this relief was sought as authorized by law. As concerns the, the agency, again, all I can point to is the record, which I think I've laid out for you in the brief. I can certainly review that for you again, including the numerous instances where Mr. Musso appeared before this Court. It became clear that he was appearing for Mr. Rubin. He said he was appearing for Mr. Rubin. Over and over again, arranging these dates, doing these things, fighting these battles. Roberts. Is any lawyer who appears for a client then susceptible of receiving service of process and, for example, if this gets reversed, can you serve Ms. McCoy? I don't think we have to serve somebody again. As we've said in footnote three, we, we affected supplemental services. Hypothetically, I'm just, I mean, at what point does the lawyer get transformed from just being a lawyer to also the agent to accept service or somebody you can serve? Exactly what is stated in the case law, he takes an active part in a proceeding related to the case. And it's shown that he is up there exercising the personal authority of this individual. Just for the sake of discussion, if you had to serve Mr. Rubin again with personal service, you could serve Ms. McCoy now, I gather. She hasn't repeatedly appeared in bankruptcy court. No. So there has to be repetitive appearances in bankruptcy court? Important appearances. I'm trying to figure out how we, how we write the rule here, if you, if you win, what the, what the dimensions of this is. I, I don't know that it's, that you could break it out that way. I think you have to look at the case law as stated. Reisman is a case cited by Ryden Miller as authoritative on this subject. Paddington Press, these are the cases. They rose out of New York where counsel appeared and exercised authority in front of the bankruptcy court on behalf of a distant plaintiff in important circumstances. Actively participated in the case in a matter integrally related. Maybe you cast it in terms of international shoe. I guess I would have to try to figure out whether that's what the court is asking  But I don't know that you can't just say that the plaintiff has to do such activity has taken place so that it would not be unfair to serve or something like that. Well, but wait a minute. Nobody's saying that it's unfair that he be here. He conducted a business here for 25 years. I guess I was not making myself clear. That was a softball. Huh? The Judge Silverman was saying, you know, how do you write this thing? And I think what you're saying is, well, you'd have to look at each case and see what was the degree of activity, what was the participation, if you will, what were the circumstances. And then you say that based upon all of those things, it would not be unfair to permit service to be made upon this agent. I think that's precisely the rule that's given. It's a totality of the circumstances rule. And that's why I say it's maybe a little kind of like international shoe. You look at all the contents and say, well, is it fair to do this? I don't know. Anyway. Is there anything further I can say to you? Any further questions that you have of me? I think the issues are pretty clear. I think there's, you know, there is a dearth of authority, as Judge Stotler said. Yeah. So. I hope I've adequately laid out the facts for you. Yes. All right. Thank you. Thank you. And would you kindly remember to give the clerk and also Ms. McCoy the Connecticut general site. Ms. McCoy. Thank you. I'll be brief. First, I'd like you to respond to the declaration in the State Superior Court case by Mr. Rubin and explain why you don't think that's sufficient. I'd be happy to do that, Your Honor. In that declaration, Mr. Rubin, and we've never denied this. Mr. Rubin said, Mr. Musso is my personal counsel. We have never denied that. Mr. Musso has represented Mr. Rubin in various different matters. He's just never represented him before the bankruptcy court. Never made it. But he says Mr. Musso has assisted me with respect to the pending focus bankruptcy. He did say that, Your Honor. And I would say – I don't know what was in his mind, but here's what I would suggest. There were a couple of instances where there was a discussion of whether Mr. Rubin or when, rather, Mr. Rubin would be deposed in the bankruptcy matter. And in connection with those discussions, Mr. Musso stated on the record to Judge March that he was Mr. Rubin's personal counsel and he would like to be present when the deposition was taken, in addition to the counsel for Focus Media. I think the reason he went to those links, if you read the transcript, is that the court was talking about setting the deposition on a date when Mr. Musso was to be on vacation. And it was quite likely the court would have said Focus Media will be represented because you have co-counsels. So to prevent that from happening, Mr. Musso said, and by the way, I'm personal counsel to Mr. Rubin. But he never said to the court, and this, I believe, is a misstatement that I need to correct. He never said, I'm here on behalf of Mr. Rubin. I'm appearing on behalf of Mr. Rubin. And that makes all the difference? Where he's in the bankruptcy court and he tells the judge, I'm Mr. Rubin's lawyer, but he never says, I'm here on behalf of Mr. Rubin. That's what this case turns on? It doesn't turn on that. It doesn't make all the difference, but it makes part of the difference. The rest of the difference is made by the holdings of those cases in New York where they say, first, the defendant has to be actively and extensively involved in the litigation. But secondly, the attorney has to exercise significant independent judgment. I believe this goes to the concept of an agent for all purposes, as Judge Wardlaw raised, such that if a person indicates, if the principle indicates that the agent can act without conferring with me and exercise their independent judgment, they're an agent for all purposes, including service of process. There is no evidence of that here. And there's no evidence that Mr. Musso was appointed to receive service of process or that he exercised significant independent judgment on behalf of Mr. Rubin. It's just not here. Ms. McCoy. I don't recall a principle of agency law from years back, and maybe it's out of date and not good anymore, that when you were attempting to establish an agent by implication or ostensible agency, that you had to look beyond the assertions of the agent to determine the agency and the extent of the agency. I don't know if that's still good law or not. Quite true, Your Honor. But if it were still good law, all of these assertions by Musso that I'm Rubin's lawyer would not apparently establish the agency or the authority for which Mr. Anderson argues. That is absolutely correct. Unless your guy acquiesces in it. With knowledge, acquiesce. I mean, if Musso, excuse me. Or there are other circumstances. Right. I think you would have the principle, knowing that this representation is going on and doing nothing about it, thereby adopting it, or perhaps there are other circumstances tendent to the representations of the agent actually appearing in court and actually doing things on behalf of the principle, perhaps, thereby validating and corroborating his statements. I would agree with that entirely. And I think the case law comports with that. I don't believe that, for example, the Olympus case that's cited, I believe in both briefs, but at least in ours, is a case where an attorney said, I'm authorized to accept service of process. Send the notice of receipt and acknowledgment to me. The client subsequently said, no, he wasn't. And the court invalidated the process. Did Rubin have his deposition taken in the case? I don't believe so. No, no. He did not have his deposition taken in the involuntary proceeding, Your Honor. He tried to appear for a deposition. There was a dispute about whether the timing was appropriate or not. And the bankruptcy court barred Mr. Rubin from testifying in the trial of the involuntary bankruptcy because he had not submitted to a deposition what the court found to be a timely fashion. Who was representing Rubin at that time? At that time, I believe that Mr. Rubin was ñ well, Mr. Rubin was represented by Jeff Mousseau at all times. Focus Media was being represented by, I believe, Elliot Dissner of Irvin, Koenig, Jensen. Did he have any ñ did he have his deposition taken in connection with the adversary proceeding? I don't know the answer to that question. I'm sorry. If it's important, I can submit something. I see that I probably need to submit a letter brief to address general life insurance cited by my opponent, and I would like to leave to do that. If the Court would like an answer to that question as well, I can certainly supply it. Anything else, Judge Thompson? Judge Wardlaw? Thank you very much. The case was argued and very well argued is submitted at this time. I can't answer the question of whether Mr. Mousseau, whether Mr. Rubin came to a deposition. Would you like me to do that?  If that's all right with you. I conducted a deposition of Mr. Rubin that lasted perhaps 45 minutes. He was on the telephone from France. There were other lawyers on the phone with him. I believe Mr. Mousseau was on ñ was either in my office or on the phone with him. Mr. Sullivan, I think, was with him in my office. Russ Milliband was on the phone with Mr. Rubin and was also with him from France. It was canceled after 45 minutes when Mr. Rubin's doctor said that he could not continue forward because of his high blood pressure and other reasons. Thank you. And that was the end of it. And Mr. Rubin never appeared for a deposition again. Ms. McCoy, did you want to add anything else on that? I don't really like the idea of recess. Thank you. If there's nothing else, we'll stand at recess. Thank you. All rise for the discussion of the next hearing. Thank you.
judges: Thompson, Silverman, Wardlaw